UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| GIANLUCA RIZZO, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | COMPLAINT FOR VIOLATION OF THE |
| vs. | : | FEDERAL SECURITIES LAWS |
| | : | |
| APPLIED OPTOELECTRONICS, INC., CHIH-HSIANG (THOMPSON) LIN and STEFAN J. MURRY, | : : : | |
| | : | |
| Defendants. | : : | |
| | : | DEMAND FOR JURY TRIAL |

Plaintiff Gianluca Rizzo ("Plaintiff"), alleges the following based upon the investigation of counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Applied Optoelectronics, Inc. ("Applied Opto" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of all purchasers of Applied Opto publicly traded securities between July 13, 2017 and August 3, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to §27 of the 1934 Act, and 28 U.S.C. §1391(b).  In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Gianluca Rizzo purchased Applied Opto securities during the Class Period as set forth in the accompanying certification, incorporated by reference herein, and has been damaged thereby.

6.      Defendant Applied Opto manufactures lasers and transceivers used to build fiber-optic networking equipment.  Its biggest customer is Amazon.com, Inc. ("Amazon"), which was responsible for 56.4% of its 2016 sales.  Applied Opto's shares trade under the ticker "AAOI" on the NASDAQ, an efficient market.

7.      Defendant Chih-Hsiang (Thompson) Lin ("Lin") founded the Company. Defendant Lin is, and at all relevant times was, Chief Executive Officer ("CEO"), President and Chairman of the Board of Applied Opto.

8.      Defendant Stefan J. Murry ("Murry") is, and at all relevant times was, Chief Financial Officer ("CFO") and Chief Strategy Officer of Applied Opto.

9.      Defendants Lin and Murry are referred to herein as the "Individual Defendants." Applied Opto and the Individual Defendants are referred to herein, collectively, as "Defendants."

10.      Defendants made, or caused to be made, false statements that artificially inflated the prices of Applied Opto securities during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Applied Opto's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual

Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

11. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Applied Opto. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Applied Opto securities was a success, as it: (i) deceived the investing public regarding Applied Opto's prospects and business; (ii) artificially inflated the prices of Applied Opto securities; and (iii) caused Plaintiff and other members of the Class to purchase Applied Opto securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

12. Defendant Applied Opto designs, manufactures and sells advanced optical products used to build broadband and fiber access networks, specifically for use in the Internet datacenter, cable television ("CATV") and fiber-to-the-home ("FTTH") networking end-market. It is a vertically integrated manufacturer. To Internet-based datacenter operators, Applied Opto supplies optical transceivers that plug into switches and servers within the datacenter and allow these network devices to send and receive data over fiber optic cables. The Company also supplies a range of products, including lasers, transmitters and transceivers, and turnkey equipment, to the CATV market.

13. On July 13, 2017, Applied Opto issued a press release announcing its preliminary financial results for the second quarter ended June 30, 2017. The press release stated in pertinent part as follows:

> *"I'm pleased to announce that we expect to deliver another record quarter with our top and bottom-line results expected to exceed our guidance," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and*

CEO. *"Again this quarter, our results were driven by improvement in our manufacturing costs, capacity expansion and solid execution by our production team. We are pleased with our performance and look forward to sharing the additional details of our second quarter results on our conference call in August."*

**Second Quarter 2017 Preliminary Unaudited Financial Result**

Revenue of approximately $117.3 million, **above the prior outlook** of $106.0 million to $112.0 million.

GAAP and non-GAAP gross margin in the range of 45.0% to 45.4%, **above the prior non-GAAP outlook** of 41.0% to 42.5%.

GAAP net income in the range from $28.0 million to $29.0 million and non-GAAP net income after tax in the range from $26.6 million to $27.6 million, **above the prior non-GAAP outlook** of $22.2 million to $24.3 million.

GAAP fully diluted earnings per share in the range of $1.37 to $1.42 and non-GAAP fully diluted earnings per share in the range of $1.31 to $1.36, using a weighted-average fully diluted share count of approximately 20.4 million shares. This is **above the prior non-GAAP outlook** of $1.09 to $1.19 per share, using approximately 20.4 million shares.

(Footnote omitted.)

14.     The statements referenced above in ¶13 were materially false and misleading when made as they failed to disclose the following adverse facts which were known by Defendants or recklessly disregarded by them:

(a)     that Amazon – to whom Applied Opto had historically sold the majority of its dated 40G transceiver portfolio – was switching to the newer 100G transceiver;

(b)     that without demand from Amazon, Applied Opto lacked the requisite demand to support manufacturing of the 40G transceiver portfolio at the same rate;

(c)     that it would take approximately six weeks to transition Applied Opto's production line to produce the amount of 100G transceiver portfolio required;

(d)     that Amazon had both sought and obtained price concessions on the 100G transceiver product being purchased from Applied Opto; and

(e)     as a result of the foregoing, Applied Opto was not on track to achieve the revenue and earnings growth in the third quarter of 2017 that it had led the market to expect.

15.     On August 3, 2017, after the market closed, Applied Opto issued a press release announcing its second quarter 2017 financial results and third quarter 2017 guidance. The release stated in pertinent part as follows:

> Lin continued, "We are pleased with our team's continued solid execution in the quarter, which marked our ninth consecutive quarter of generating record datacenter revenue. ***However, as we look into the third quarter, we see softer than expected demand for our 40G solutions with one of our large customers that will offset the sequential growth and increased demand we expect in 100G*** . . . ."

> **Second Quarter 2017 Financial Summary**

> Total revenue increased to $117.4 million, up 112% compared with $55.3 million in the second quarter 2016 and up 22% compared with $96.2 million in the first quarter of 2017.

> GAAP gross margin increased to 45.4%, up from 31.3% in the second quarter 2016 and 43.1% in the first quarter of 2017. Non-GAAP gross margin increased to 45.5%, up from 31.4% in the second quarter 2016 and 43.2% in the first quarter of 2017.

> GAAP net income increased to $29.1 million, or $1.43 per diluted share, compared with net income of $0.6 million, or $0.03 per diluted share in the second quarter 2016, and net income of $19.8 million, or $1.00 per diluted share in the first quarter of 2017. The effective GAAP income tax rate for the quarter was 15%.

> Non-GAAP net income increased to $31.3 million, or $1.54 per diluted share, compared with non-GAAP net income of $2.8 million, or $0.16 per diluted share in the second quarter 2016, and non-GAAP net income of $21.8 million, or $1.10 per diluted share in the first quarter of 2017.

> *       *       *

> **Third Quarter 2017 Business Outlook**

> For the third quarter of 2017, the company currently expects:

- 5 -

Revenue in the range of $107 million to $115 million.

Non-GAAP gross margin in the range of 43.0% to 44.5%.

Non-GAAP net income in the range of $26.6 million to $29.4 million, and non-GAAP fully diluted earnings per share in the range of $1.30 to $1.43 using approximately 20.5 million shares.

(Footnote omitted.)

16.    During a conference call held with analysts and investors later that day, defendant Murry opened his remarks by disclosing the loss of Amazon's 40G business (without expressly identifying Amazon), stating in pertinent part as follows:

In this quarter, 57% of our datacenter revenue was derived from our 40G datacenter products and 39% was from our 100G products, which represents an increase of 62% in 100G sales from the prior quarter.

\*        \*        \*

As a result of these trends, along with our customers continued adoption of 100G technology, we expect 100G to continue to grow as a percent of our datacenter revenue and to exceed 40G sales in late Q3 or early Q4 of this year. *As we look into Q3, we see softer than expected demand for our 40G solutions with one of our large datacenter customers* that will offset the sequential growth and increased demand we expect to see in 100G.  This slowdown in 40G demand has been anticipated for some time, *but the decline in Q3 is greater than previously expected*.

\*        \*        \*

*In the second quarter, we had 2, 10% or greater customers in the datacenter business that contributed 47% and 27% of total revenue, respectively*.  Additionally, our third largest datacenter customer contributed approximately 9% of total revenue in Q2, an increase of 83% sequentially.

We continue to expect to have 3 hyperscale customers, each represent more than 10% of our revenue for the full year 2017.

\*        \*        \*

Moving now to our Q3 outlook.  We expect Q3 revenue to be between $107 million and $115 million, representing 58% year-over-year growth at the midpoint.  *On a sequential basis our guidance represents a decline of approximately 5% at the midpoint, reflecting a decrease in 40G demand* offset by continued growth in 100G which we expect to increase *even as planned*

- 6 -

*pricing reductions take effect in Q3*.  We currently expect to deliver sequential revenue growth in the fourth quarter, as we continued to ramp 100G capacity.  We expect Q3 gross margin to be in the range of 43% to 44.5%.  Net income is expected to be in the range of $26.6 million to $29.4 million and EPS between $1.30 per share and $1.43 per share, using a weighted average fully diluted average share count of approximately 20.5 million shares.

17.     Later in the call, during the question and answer session, analysts raised questions about the loss of demand for the 40G transceiver, the impact on profit margins, the impact on operations, and why Applied Opto had not communicated the Amazon negotiations to investors when they pre-announced on July 13, 2017.  The following exchange took place:

**[Simon Leopold, Raymond James & Assoc.:]**  [I]n terms of the gross margin guidance, I would've thought that if you had not too bad a sequential volume decline and I don't think you do, and you're indicating what I would believe would be a favorable mix, meaning that *you're going to see more 100 gig in September and less 40 gig and making this assumption that 100 gig is better gross margin, so maybe that's flawed.  Can you help me understand what are the drivers for the lower sequential gross margins in September than June?*

**[Murry:]** *We have some price reductions as we mentioned in the prepared remarks that took – that are taking effect during Q3.*

**[Leopold:]**  And that's the gist of it?  Is it correct to assume that 100 gig gross margins are better than 40 gig?  Or is that flawed assumption?

**[Murry:]**  That's generally true.  *Although, again, you have to look at product-by-product basis to see the details, which of course we can't go into it at this point.*

**[Leopold:]**  Okay.  And you *did indicate that you expect sequential improvement again in December,* maybe help us understand sort of the basis for your confidence.  Are these committed orders?  *Is this based on the windows of guidance you're getting from your customers?*  Or is it based on the third customer coming back into 10% ranks.  *Help us understand the drivers for confidence in 4Q?*

**[Murry:]**  We expect to see strong growth from 2 out of the 3 large datacenter customers that we have *and a resumption of growth from our largest customer*.  In addition to that – you asked whether these are committed orders.  There are some committed orders out there, not all of that expectation is committed at this point.  But we do have a significant amount of committed orders and good forecast from all 3 of our customers.

\*     \*     \*

**[Paul Silverstein, Cowen & Co.:]**   I know pricing is always a sensitive topic, but *to the extend that you spoke – referenced the price declines in Q3, can you give us any sense of quantification?*

**[Murry**:] It's not across the board.  *It's with certain customers on certain products though we can't comment on it directly, but it is a factor for us*. It's not something that is not unanticipated, as we mentioned in the script, *that that's been communicated with the customer and negotiated for some time*. . . .

**[Silverstein:]** Stefan can I – if I said this before, my apologies, but I assume it's implied by the gross margin guidance, *but was the degree – I'll ask the question anyway – was the degree of price reduction less, more, or consistent with what you were expecting?*

**[Murry:]**  *Absolutely consistent with what we expected*.

\*     \*     \*

**[Troy Jensen, Piper Jaffray:]**  All right.  One follow-up then on this – the planned pricing reductions.   *Have you historically had Q3 price negotiations?  Or is it kind of new that the customers are pushing it through now?*

**[Murry**:]  No.  As we've said for years, I mean, the pricing negotiations that we have with our customers are on an ongoing basis and they occur [at] no particularly defined time throughout the year.  That is, they occur randomly throughout the year whenever it's appropriate.  *But these price negotiations that we have undergone are something that we do in advance with the customer, and we know what those prices are expected to be on a go forward basis*.

\*     \*     \*

**[Mark Kelleher, D.A. Davidson & Co.:]**  Great.   Just looking at the 40G.  If you look at the datacenter revenue in total, it was up 25% sequentially. You gave the 100 gig up 62% sequentially.  *So clearly, 40G was down pretty significantly.  Are you expecting that to accelerate, moderate?  What do you expect that downward task to look like over the next couple of quarters?*

**[Murry**:]  *Well, our customers are moving away from 40 gig into 100 gig* which is something that we've said and it shouldn't be a surprise [to] anybody in the industry, I think, that the transition is occurring.  For several quarters, we've said, that we expected that – our revenue to crossover meaning 100 gig will start to exceed 40 gig revenue, in late Q3 or Q4, and we continue to believe that. *The rate of reduction or the speed at which that process is occurring, particularly in Q3, is a little bit surprising to us*, but it's definitely – the trend is

- 8 -

clearly not unexpected.  And what we're seeing is consistent with that trend *just a little bit faster than what we have expected*.

\*      \*      \*

[**Richard Shannon, Craig-Hallum Capital Group LLC:**]  Maybe      I'll first follow-up on the 40 gig topic here, *sounds like you've got one customer who's talking about lowering forecasts for 40 gig*.  Any indication of other customers – other major cloud customers also taking down their 40 gig in the near future and does your fourth quarter guidance – so you're talking about revenue growth – implying any other significant step down?

[**Murry:**]  *Other customers are also reducing their 40 gig.  As you would expect, as they transition to 100 gig*.  We've known about that and we've expected it, as I mentioned on the last answer.  *So the only surprise this quarter is the extent to which one customer is decreasing their forecast or the speed at which they're decreasing their forecast for 40G*.

\*      \*      \*

[**Brian Alger, Roth Capital Partners:**]  Right.  Well, it seems [like] you clearly have a pretty good handle on what's going on with 100G and next generation type of designs with your customers.  *I'm curious as to how – you seem to have been caught off-guard in terms of the decline on 40 gig.  Is that something that transferred from a customer recently?  Or is that something that was communicated in the middle of the quarter?*

[**Murry:**]  It's a recent development.  And again, *it's not that we didn't expect 40 gig to decline with this customer or the other customers, we knew it would.  It's just coming a little bit faster*, which, in the end, means a faster transition to 100 gig, which is not a bad thing.  *But obviously, in this particular quarter, it's happened faster than we expected*.

[**Alger:**]  Understand.  I think we all expect the transition to occur and we all think it's a positive, certainly for you guys, given your product portfolio.  *I guess where I'm going with this is, it's a bit unusual for a company to preannounce a very strong beat and then to have something like this come in a couple of weeks later from that announcement.  And I'm just – it seems as though maybe you guys were informed after your positive pre-announcement?*

[**Murry:**]  That is true, but just to be clear, *the pre-announcement is made when we see the results of the quarter differing materially from the last guidance that we put out with The Street. That's why we preannounce. It's not an indication of future, it's an indication that the past has been very different from what we last guided The Street.  In other words, we don't want – when we know that there is different information from what we've previously guided for, we want to get that information in the hands of investors as quickly as positive. That's what investors have asked us to do and that's what we think is the right*

- 9 -

*thing to do*.  But that's not necessarily an indication of any particular thing about the future.  In this case, the information that we got about the 40 gig actually did happen post the pre-announcement, *but that wouldn't necessarily change our thinking about whether or not to preannounce*.

\*      \*      \*

[**Alexander Henderson, Needham & Co.:**] *I wanted to talk a little bit about the mechanics around the production of 40 gig versus 100 gig related products.  So to the extent that you have a quick slowdown in 40 gig, what is the change-over time that it takes for you to take that capacity that you would have otherwise have [sic] allocated to 40 gig based components and then shift it over to the 100 gig product line?  Is the reason the 40 gig decline is a problem is because it's created a mismatch between where your demand is and where your production is?*  And therefore, as you resolve that mismatch, you rebound pretty quickly on the production of transceivers that then have a better match to the end market demand?  Because I'm having a hard time understanding how you would have substantial increase in laser production and positive mix shift unless you have a mismatch?

[**Murry:**]  Well, it doesn't take us that long to switch over the production.  But as Thompson mentioned, *there's about a 6-week time from when we produce a laser to when [it] actually gets shipped out as a transceiver.  And so the time to actually shift over the production is not long, but the time to – between doing that shift and when you start to see the end product transceivers coming-out is about 6 weeks*.

[**Lin:**]  No problem to change from 10G to 25G laser.  It takes another 6 weeks for the record growth and processing and the chip testing.

[**Henderson:**]  *So again, if you have a 6-week differential, you should be able over the course of the quarter to re-align your production to the end market demand mix, and therefore, as you go into the fourth quarter, I would think that you would be able then to match closely your laser and transceiver production to the mix of demand you're getting from the field and, therefore, you should not have any issues on weakness on 40 gig in 3Q impacting 4Q.  Logically, that would follow.  Is that not reasonable line of logic?*

[**Murry:**]  If I understand your comment or you[r] question, you're saying that *by the end of the quarter, we should have our resources realigned.  And going into the fourth quarter*, there shouldn't be an overhang or something from the mix shift.  If that's your question, the answer is yes.  *Yes, that's correct*.

- 10 -

18.     In response to these disclosures, the price of Applied Opto common stock declined from its close of $97.99 per share on August 3, 2017 to close at $64.60 per share on August 4, 2017, on extremely heavy trading volume.

19.     The market for Applied Opto securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Applied Opto securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased Applied Opto securities relying upon the integrity of the market prices of Applied Opto securities and market information relating to Applied Opto, and have been damaged thereby.

20.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Applied Opto securities by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

21.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Applied Opto's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Applied Opto and its business, prospects and operations, thus causing the prices of Applied Opto securities to be overvalued and artificially inflated at all relevant times.

- 11 -

Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Applied Opto securities at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the prices of Applied Opto securities was removed and the prices of Applied Opto securities declined dramatically causing losses to Plaintiff and the other members of the Class.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

22.    At all relevant times, the market for Applied Opto securities was an efficient market for the following reasons, among others:

(a)    Applied Opto stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    According to the Company's second quarter 2017 10-Q, the Company had more than 19.3 million shares outstanding as of August 2, 2017.  During the Class Period, on average, approximately 5 million shares of Applied Opto stock were traded on a daily basis, demonstrating a very active and broad market for Applied Opto stock and permitting a very strong presumption of an efficient market;

(c)    Applied Opto claims to be qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d)    as a regulated issuer, Applied Opto filed periodic public reports with the SEC and the NASDAQ;

(e)    Applied Opto regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)     Applied Opto was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

23.     As a result of the foregoing, the market for Applied Opto securities promptly digested current information regarding Applied Opto from all publicly available sources and reflected such information in the price of Applied Opto shares.  Under these circumstances, all purchasers of Applied Opto securities during the Class Period suffered similar injury through their purchase of Applied Opto securities at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

24.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Applied Opto who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the publicly traded securities of Applied Opto during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Applied Opto shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Applied Opto or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

- 14 -

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Applied Opto; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of the 1934 Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

31.     Plaintiff incorporates ¶¶1-30 by reference as if fully set forth herein.

32.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 15 -

33.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Applied Opto securities during the Class Period.

34.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Applied Opto securities.  Plaintiff and the Class would not have purchased Applied Opto securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

35.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Applied Opto securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the 1934 Act**
**Against All Defendants**

36.     Plaintiff incorporates ¶¶1-35 by reference as if fully set forth herein.

37.     The Individual Defendants acted as controlling persons of Applied Opto within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of Applied Opto, and their ownership of Applied Opto stock, the Individual Defendants had the power and authority to cause Applied Opto to engage in the wrongful conduct complained of

herein.  Applied Opto controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  September 11, 2017

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY


/s/ Samuel H. Rudman
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

- 17 -

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
FrankJ@johnsonfistel.com


JOHNSON FISTEL, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Telephone: 212/802-1486
212/602-1592 (fax)
Scott@johnsonfistel.com

Attorneys for Plaintiff

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Gianluca Rizzo, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel and authorize its filing.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 24/07/2017   80 | 95,85 | |
| 24/07/2017   150 | 95,85 | |
| 27/07/2017   42 | 99,94 | |
| 27/07/2017   18 | 99,94 | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| haven't sold | | |

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and

travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of August, 2017.

DocuSigned by:

*Gianluca Rizzo*

E8FEF1221EC0439...
Gianluca Rizzo